**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHAEL MURRAY,**

                              **Plaintiff,**

      vs.                                    **9:22-CV-592**
                                               **(MAD/PJE)**

**COUNTY OF ALBANY, CRAIG APPLE,**
**MICHAEL LYONS, and LAWRENCE WARNER,**

                              **Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**SIVIN, MILLER & ROCHE LLP**      **EDWARD SIVIN, ESQ**.
20 Vesey Street                    **DAVID ROCHE, ESQ.**
Suite 1400                       **GLENN D. MILLER, ESQ.**
New York, New York 10007
Attorneys for Plaintiff

**ALBANY COUNTY ATTORNEY'S**    **KEVIN MCDONALD CANNIZZARO,**
**OFFICE**                          **ESQ.**
112 State Street                  **MEGAN B. VAN AKEN, ESQ.**
Albany, New York 12207        **MICHAEL L. GOLDSTEIN, ESQ.**
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On June 6, 2022, Plaintiff filed a complaint alleging that Defendants Albany County, Sheriff Craig Apple, Superintendent Michael Lyons, and First Sergeant Lawrence Warner failed to protect Plaintiff from physical assaults perpetrated by other incarcerated individuals while Plaintiff was a pre-trial detainee housed at Albany County Correctional Facility ("ACCF"). *See* Dkt. No. 1. Plaintiff brings claims pursuant to 42 U.S.C. § 1983 for Defendants' alleged

deliberate indifference to Plaintiff's health and safety in violation of the Eighth and Fourteenth Amendments, as well as a negligence and recklessness under New York State Law. *See id.*

Presently before the Court is Defendants' motion for summary judgment, *see* Dkt. No. 44, Plaintiff's response in opposition, *see* Dkt. No. 47, and Defendants' reply. *See* Dkt. No. 50. For the following reasons, Defendants' motion is granted in part and denied in part.[1]

## II. BACKGROUND[2]

Plaintiff was incarcerated at ACCF on May 11, 2021. *See* Dkt. No. 47-13 at ¶ 1. Prior to Plaintiff's arrival at ACCF, there was a long-standing rivalry between incarcerated individuals from Uptown Albany versus Downtown Albany, which the parties refer to as an "Uptown Downtown issue." *Id.* at ¶ 2. There were gangs involved on both sides. *See id.* at ¶ 3. ACCF was, and is, aware of the rivalry. *See id.* at ¶ 4. Defendant Lyons, ACCF's Superintendent, testified during his deposition that, prior to 2021, ACCF did not have any specific procedures in place to minimize violence between the two groups. *See id.* at ¶ 5 (citation omitted). ACCF did, however, have policies and procedures in place to address violence, generally. *See id.* at ¶ 6.

When an individual arrives at ACCF, the facility staff takes the individual's address and asks whether the individual has any gang affiliations. *See id.* at ¶ 7. This is to help determine where the incarcerated individual should be housed. *See id.* at ¶ 8. In 2021, the Second West tier housed Uptown members, the Third West tier was "covert segregation," the First East tier was protective custody, suicide watch, and minors, the Third East tier housed Downtown members,

---

[1] Plaintiff does not oppose Defendants' motion as it relates to the deliberate indifference claim against Defendant Lyons. *See* Dkt. No. 47-14 at 9 n.1. As such, that aspect of Defendants' motion is granted without further analysis.

[2] Defendants submitted a statement of material facts as required by Local Rule 56.1. *See* Dkt. No. 44-17. Plaintiff responded as required by the Local Rule. *See* Dkt. No. 47-13. Plaintiff reiterated each of Defendants' statements prior to admitting or disputing the facts; therefore, the Court will cite to Plaintiff's response throughout its recitation of the factual background. *See id.*

and the Second East tier housed Downtown members. *See id.* at ¶ 9. If an incarcerated individual told ACCF staff that he or she could not live on a specific tier, ACCF staff would usually comply with that request. *See id.* at ¶ 10.

When Plaintiff arrived at ACCF, staff asked him if he had any issues with other incarcerated individuals at ACCF. *See id.* at ¶ 11. Plaintiff said he did not. *See id.* Plaintiff informed staff "that he was 'originally from Uptown, but [] lived Downtown for years and [] lived Uptown for years." *Id.* at ¶ 12 (quotation omitted). Plaintiff agreed during his initial intake that he could live anywhere within the facility. *See id.* at ¶¶ 13-14. He was not concerned at that time about being placed in either an Uptown or Downtown tier. *See id.* at ¶ 15.

Plaintiff was placed in Four East tier from May 11 through May 25, 2021. *See id.* at ¶ 17. Plaintiff did not communicate any safety concerns with ACCF staff. *See id.* at ¶ 18. On May 25, 2021, Plaintiff was transferred to One West tier which was comprised of primarily Downtown members. *See id.* at ¶¶ 19-20. Plaintiff testified during his deposition "that '[t]here was one person that was from Uptown that was on the tier . . . because he was gang related.'" *Id.* at ¶ 20 (quoting Dkt. No. 47-1 at 42-43). When Plaintiff arrived at One West, he did not have any safety concerns. *See id.* at ¶ 21. He did not have any "beef" with Downtown or Uptown members at that time. *Id.* at ¶¶ 22-23. Plaintiff did not communicate any safety concerns to ACCF staff at that time. *See id.* at ¶ 24.

On June 9, 2021, a dispute arose out of a card game. *See id.* at ¶ 25. Plaintiff testified during his deposition that "[e]verybody that was involved with the incident was from Downtown except for me and my co-defendant." Dkt. No. 47-1 at 58. Defendants contend Plaintiff did not have any "issues or altercations with those inmates, did not fear for his safety, and did not inform ACCF staff of any safety concerns" prior to the June 9, 2021, assault. Dkt. No. 47-13 at ¶ 27.

3

Plaintiff notes that he did not have safety concerns with the specific individuals he was playing cards with, but that the individuals who attacked him consisted of more than just the people playing cards. *See id.* After the assault, ACCF staff spoke with Plaintiff in his cell and asked Plaintiff for the identities of the assailants. *See id.* at ¶ 28. Plaintiff did not provide any names to ACCF staff, and he testified during his deposition that this was "because that'll put [his] life in jeopardy." *Id.* at ¶ 29 (quotation omitted). Plaintiff requested medical treatment, which he received later that day. *See id.* at ¶¶ 38, 30. Plaintiff was moved to B building. *See id.* at ¶ 30.

B Building was a mix of Uptown and Downtown members who were not affiliated with the rivalry. *See id.* at ¶ 31. Plaintiff did not fear for his safety from any of the members living in B Building at that time. *See id.* at ¶ 32. On June 14, 2021, Plaintiff drafted a grievance about the June 9 assault. *See id.*; *see also* Dkt. No. 47-2 at 1-2. Plaintiff also contacted family members "pleading with them to contact Superintendent Lyons and inform him that Plaintiff felt he was at risk of being assaulted again." Dkt. No. 47-13 at 24, ¶ 2.[3] Multiple family members, including Plaintiff's aunt, Kim Boyd, called the Albany County Sheriff's Office and spoke to Defendant Sheriff Craig Apple to report their concerns about Plaintiff's safety. *See id.* at ¶¶ 3-4. Ms. Boyd declared as follows:

> After the first incident on June 9, 2021, I called Sheriff Apple and informed him that [Plaintiff] had been assaulted by multiple inmates. I expressed my concerns about [Plaintiff's] safety and requested that he be moved or protected. Sheriff Apple told me he would look into it and that it "doesn't sound like something his guards would do." He never called me back after that conversation.

---

[3] In response to Defendants' motion, Plaintiff submitted a statement of additional material facts as permitted by Local Rule 56.1. *See* Dkt. No. 47-13 at 24. Plaintiff's statement contains paragraph numbers which do not continue from the paragraph numbers used in Plaintiff's response to Defendants' statement but starts over with paragraph number one. *See id.* Accordingly, when the Court cites to Plaintiff's statement of additional material facts, it will cite to a page number and a paragraph number. Defendants did not respond to Plaintiff's statement of additional material facts.

Dkt. No. 47-5 at ¶ 4.

On July 9, 2021, Plaintiff was removed from B Building because of his participation in a peaceful protest with other incarcerated individuals. *See* Dkt. No. 47-13 at ¶ 33. ACCF staff relocated Plaintiff to the left side of the Three East tier. *See id.* at ¶ 34. Plaintiff learned there were individuals living in the tier who were involved in the June 9 assault, and he requested to be moved to another tier. *See id.* at ¶ 35. Plaintiff purportedly told Defendant Warner that he could not live on Three East because there were individuals housed there that assaulted him on One West, but Warner said it was "above [his] pay grade." *Id.* at 25, ¶ 5.

Plaintiff testified during his deposition that he was not sure whether Warner asked Plaintiff for the names of the individuals who were involved in the assault. *See* Dkt. No. 47-13 at ¶ 38 (citation omitted). Defendants assert that Plaintiff "did nothing" to help ACCF identify the incarcerated individuals Plaintiff was concerned about, but Plaintiff notes that he explained during his deposition that he was unaware of the other inmates' full legal names, and he was "unsure if ACCF staffed ever asked for specific [full legal] names in the first instance." *Id.* at ¶ 39.

Relying on the Population and Count Sheets from ACCF, Defendants assert that there was only one incarcerated individual living in the left side of Three East that had been involved in the June 9 assault. *See id.* at ¶ 40. Plaintiff disputes Defendants' contention, asserting that, during his deposition, he recognized two names from the Count Sheet, but that he could not remember all of the specific people's names of who he fears because he remembered only faces or nick names. *See id.* At the end of Plaintiff and Defendant Warner's "conversation, Plaintiff told Warner that he was going to kill himself and that he wanted to see mental health, a statement he made for the purpose of being relocated." *Id.* at ¶ 41. Plaintiff was relocated to the right side of One East tier.

*See id.* at ¶ 42.  While housed there, Plaintiff was on constant supervision because of suicide

watch.  *See id.* at ¶ 43.

Plaintiff met with an ACCF mental health worker and told her about "those same concerns

he communicated to Warner about being moved to a new tier, insisted multiple times that [she]

contact a staff member to have him arranged to be moved elsewhere, and was told by [the worker]

simply that because '[Mental Health] does not have any authority over housing locations,' she

'could not do that.'"  Dkt. No. 47-13 at 25, ¶ 6 (quotation omitted).

On July 12, 2021, the movement log indicates that Defendant Warner directed Plaintiff be

moved from One East back to Three East.  *See id.* at 26, ¶ 9.  Plaintiff sent a message to his

godmother on August 1, 3, and 11, 2021, stating that Defendant Warner and Commander Crudo

decided to "throw [Plaintiff] back to the wolves meaning put me back on third west."  *Id.* at ¶ 44.

Plaintiff made a typographical error in his message because he "meant to relay that Warner had

told him a decision was made to put him back on three east—i.e., the tier where he came from just

previously, where he recognized individuals who had assaulted him on June 9th, and from where

he threatened suicide in order to be moved."  *Id.*

Plaintiff was moved to the right side of Three East.  *See id.* at ¶ 45.  There were still

individuals from the Downtown gang living in that tier of ACCF.  *See id.* at ¶ 46.  Plaintiff did not

"request[] protective custody because 'they're going to ask you for names.  And you're going to be

labeled a rat.  And then you're going to be stabbed and cut and shot and all this other shit

everywhere else you go.'"  *Id.* at ¶ 47.  "Plaintiff testified that he would rather be jumped than go

into protective custody."  *Id.* at ¶ 48; *see also* Dkt. No. 47-1 at 105.

Defendants assert that Plaintiff was "doing fine" on Three East because he did not have

any "beef that [he] knew about at that time," but he was worried about "literally every inmate in

the jail." Dkt. No. 47-13 at ¶ 49. Plaintiff quotes parts of his deposition testimony, wherein he stated that he "was concerned for [his] safety ever since the incident of July 9th. . . . *Id.* (quoting Dkt. No. 47-1 at 109). Plaintiff remained in Three East until July 23, 2021. *See id.* at ¶ 50. On July 23, 2021, Plaintiff was assaulted at 3:56 PM and Defendant Warner checked out of duty at 4:10 PM. *See id.* at ¶ 10. More specifically, Plaintiff was walking back to his cell after getting his mail and he was struck from behind in the middle of the tier. *See id.* at ¶ 52. During his deposition, Plaintiff stated that he knew the name of one of his assailants but could not remember at that time. *See* Dkt. No. 47-1 at 118. He knew the assailant was "from the Arbor Hill." *Id.* Plaintiff was hospitalized for nine days after the assault. *See* Dkt. No. 47-13 at ¶ 54.

Defendant Apple and Commander Crudo were notified of the assault. *See* Dkt. No. 47-9 at 4. Ms. Boyd called Defendant Apple, again. *See* Dkt. No. 47-5 at ¶ 5. Ms. Boyd declared as follows:

> Following the second assault on July 23, 2021, I called Sheriff Apple again. I informed him of this second attack on [Plaintiff] and reiterated my fears for his safety. I pleaded with Sheriff Apple to take action to protect [Plaintiff]. Sheriff Apple again said he would look into it and that he wasn't sure how it happened. Once again, he never followed up with me after this call.

*Id.*

Plaintiff was then moved to the Special Housing Unit ("SHU") on Four East tier. *See id.* at ¶ 55. On August 3, 2021, Plaintiff requested to speak with Defendant Lyons and to be transferred to involuntary protective custody or another facility. *See* Dkt. No. 47-13 at 27, ¶ 13. Plaintiff explained he had surgery on his orbital bone after being jumped. *See* Dkt. No. 47-10.

Plaintiff was transferred to B Building on August 4, 2021. *See* Dkt. No. 47-13 at ¶ 56. Plaintiff was on "medical keep lock," which meant he was "confined to his cell except to go to

medical or a visit, take a shower, or use the phone." *Id.* at ¶ 57. Plaintiff testified that he also

thought this meant "he 'cannot . . . be in arm's reach of any inmate.'" *Id.* (quoting Dkt. No. 47-1 at

125). Between August 4 and August 6, 2021, Plaintiff's cell was not opened for any

impermissible reason. *See id.* at ¶ 58.

On August 7, 2021, Plaintiff's cell door was opened. *See id.* at ¶ 60. Plaintiff did not

notify ACCF staff because he "wanted some freedom, and [] didn't want to be locked in [his] cell

24 hours a day." *Id.* (quotation omitted). Plaintiff was attacked from behind by an incarcerated

individual named "Doughboy[,]" and another incarcerated individual named "Marcus" was

potentially involved. *Id.* at ¶ 61. Plaintiff agreed during his deposition that he had not previously

complained to ACCF staff about these specific individuals. *See id.* at ¶ 62. After this assault,

Defendant Warner placed Plaintiff into involuntary protective custody until Plaintiff's release

from ACCF. *See id.* at ¶ 63.

On August 8, 2021, Plaintiff filed a grievance detailing the three assaults, his conversation

with Defendant Warner wherein Plaintiff stated he could not live in Three East tier, and

Defendant Warner's alleged statement about throwing Plaintiff "back to the wolves on 3 East."

Dkt. No. 47-2 at 3.

Ms. Boyd called Defendant Apple a third time. *See* Dkt. No. 47-13 at 28, ¶ 14. Ms. Boyd

declared under the penalty of perjury that "[a]fter each of the three assault incidents against

[Plaintiff] at [ACCF] in 2021, [she] personally called Sheriff Craig Apple to report [her] concerns

about [Plaintiff's] safety." Dkt. No. 47-5 at ¶ 3. Specifically, regarding her third call, Ms. Boyd

attested as follows:

> After the third assault on August 7, 2021, I called Sheriff Apple for
> a third time. I expressed my outrage that [Plaintiff] had been
> attacked yet again despite my prior warnings. This time, Sheriff

> Apple told me that [Plaintiff] was supposed to be in protective
> custody and said there was "no way he could've gotten out unless
> one of his guards let him out." Sheriff Apple specifically told me
> that this third attack was due to "the neglect of my men," and that
> he would "really look into it." This was the last time I heard from
> Sheriff Apple regarding this matter.

*Id.* at ¶ 6.

Plaintiff asserts that incarcerated individuals were able to move between the left side and right side of a tier with relative ease. *See* Dkt. No. 47-13 at 28, ¶ 15. Plaintiff reiterated he did not want to be placed in voluntary protective custody because it would have required him to provide the names of his assailants, and he feared retaliation. *See id.* at 29, ¶ 16.

### III. DISCUSSION

**A.    Legal Standard**

"The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* FED. R. CIV. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426

F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

However, irrelevant or unnecessary factual disputes do not preclude summary judgment. *See*

*Anderson*, 477 U.S. at 248.  Only genuine disputes about a material fact, such that "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party" will preclude

summary judgment. *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that

there is no genuine issue of material fact to be decided with respect to any essential element of the

claim." *Doane*, 369 F. Supp. 3d at 438.  If the moving party establishes a prima facie basis for

summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who

must then "show, through affidavits or otherwise, that there is a material issue of fact for trial"

that a reasonable jury could resolve in its favor. *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635.

Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute

between the parties[,] will not defeat an otherwise properly supported motion for summary

judgment." *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also*

*Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are

not created by conclusory allegations").  The nonmoving party must show by more than a

"scintilla of evidence" that "a fact-finder could reasonably find for the non-movant." *Heublein*,

996 F.2d at 1461.  In determining the existence of any genuine disputes of material fact, "a court

must resolve any ambiguities and draw all inferences from the facts in a light most favorable to

the nonmoving party." *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90,

94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017)); *see*

*also Jeffreys*, 426 F.3d at 553.

**B.    Failure to Protect**

"'The Due Process Clause of the Fourteenth Amendment protects pre-trial detainees . . . against intolerable prison conditions.'" *Damon v. New York*, No. 8:23-CV-74, 2023 WL 11965130, *14 (N.D.N.Y. Mar. 28, 2023) (quoting *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 267 (N.D.N.Y. 2008)); *see also Walker v. Schult*, 717 F.3d 119, 128 (2d Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "'The failure to protect a pre-trial detainee from harm is one type of intolerable prison condition. Thus, a prison official's deliberate indifference to a substantial risk of serious harm to an inmate may form the basis of a deliberate indifference claim.'" *Damon*, 2023 WL 11965130, at *14 (quotation omitted). "Not every injury suffered by one inmate at the hands of another imposes constitutional liability on officials responsible for the victim's safety." *Little v. Cnty. of Nassau*, 708 F. Supp. 3d 252, 263 (E.D.N.Y. 2023) (citation omitted).

"A plaintiff must make two showings to prove a deliberate-indifference claim under the Fourteenth Amendment, including when invoking a theory of failure to protect against (*i.e.*, prevent) an inmate attack." *Id.* "The first is 'an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process.'" *Id.* (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). "The second is 'a "subjective prong" . . . showing that the officer acted with at least deliberate indifference to the challenged conditions.'" *Id.* (quotation omitted).

"'[W]hen a prisoner is subjected to specific threats from another inmate, and there are indication[s] that the threat will be carried out, the failure of prison officials to act may give rise to a deliberate indifference claim.'" *Damon*, 2023 WL 11965130, at *14 (quoting *Hartry v. Cnty. of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010)). "'[T]he objective prong can be satisfied even where no serious physical injury results.'" *Id.* (quoting *Randle v. Alexander*, 960 F. Supp. 2d

457, 473-74 (S.D.N.Y. 2013)) (citation omitted).  "At bottom, [i]n assessing whether the risk of

an inmate's violence against other inmates is sufficiently serious, to trigger constitutional

protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an

attack, but rather the existence of a substantial risk of serious harm." *Id.*

"Importantly, '[c]ourts routinely deny deliberate indifference claims based upon surprise

attacks.'"  *Vazquez v. City of New York*, No. 1:21-CV-01573, 2022 WL 2704763, *11 (S.D.N.Y.

June 17, 2022) (quoting *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363

(S.D.N.Y. 2013)).  "For a Fourteenth Amendment claim, a substantial risk of serious harm 'can be

demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker,

coupled with a complaint by a plaintiff regarding the altercation or a request by [a] plaintiff to be

separated from the attacker.'"  *Id.* (quoting *Scott v. Westchester Cnty.*, 434 F. Supp. 3d 188, 198

(S.D.N.Y. 2020)).

### 1. *Objective Prong*

As Plaintiff states in his response memorandum of law, "other than their brief, conclusory

assertion that Plaintiff's 'Complaint does not [sic] an excessive risk to his health and safety,'

Defendants do not actually dispute that Plaintiff was confined in conditions that objectively posed

an unreasonable risk of serious harm."  Dkt. No. 47-14 at 15 (quoting Dkt. No. 44-16 at 13).

Defendants do not address this in their reply.  *See generally* Dkt. No. 50.  Despite Defendants lack

of briefing on the issue, the Court will first address the objective prong of Plaintiff's deliberate

indifference claims.

"[R]elying on a general risk of harm requires a showing 'of a history of prior inmate-on-

inmate attacks similar to the one suffered by the plaintiff and that the measures th[at] should have

taken in response to such prior attacks would have prevented the attack on the plaintiff.'"  *Little*,

708 F. Supp. 3d at 266 (quoting *Parris*, 947 F. Supp. 2d at 363); *see also House v. City of New York*, No. 18-CV-6693, 2020 WL 6891830, \*11 (S.D.N.Y. Nov. 24, 2020) ("A previous altercation may support the factual finding of a substantial risk of serious harm, but there is no requirement of a prior altercation").

Plaintiff has raised a dispute of fact sufficient to withstand summary judgment on the objective prong of his deliberate indifference claims.  First, insofar as Plaintiff focuses on the seriousness of the injuries he sustained from the assaults, *see* Dkt. No. 47-14 at 20, courts have noted that the primary focus of the objective prong inquiry is not the extent of a plaintiff's physical injuries, but the existence of a *risk* of serious harm.  *See, e.g.*, *Randle v. Alexander*, 960 F. Supp. 2d 457, 474 (S.D.N.Y. 2013).  Regardless, as Plaintiff explains, courts have considered the existence of very serious physical injuries requiring stitches or outside medical care in analyzing the objective prong.  *See* Dkt. No. 47-14 at 20 (citing *Hill v. Annucci*, No. 9:18-CV-1203, 2019 WL 8192266, \*6 (N.D.N.Y. Nov. 25, 2019) (collecting cases)).  It is undisputed that because of the assaults, Plaintiff was hospitalized for over one week and suffered a fractured orbital bone and other injuries that required surgery.  *See* Dkt. No. 44-13 at ¶ 54; Dkt. No. 47-14 at 20; Dkt. No. 47-12.

The seriousness of Plaintiff's injuries combined with the nature of the assaults—that there were multiple assaults that occurred in locations Plaintiff had previously been assaulted—raises a question of fact for a jury to determine whether there existed a sufficiently serious risk of harm.  Specifically, Plaintiff has presented his own deposition testimony and the messages he sent to family members explaining that he informed Defendant Warner there were individuals living on Three East tier that had previously assaulted him.  *See* Dkt. No. 47-1; Dkt. No. 44-4 at 317, 319, 322.  Despite this alleged warning, Plaintiff was placed in Three East and assaulted.  *See* Dkt. No.

47-14.  Likewise, Plaintiff was in medical keep lock status and his cell door should not be opened. *See* Dkt. No. 47-13 at ¶ 57.  Yet it was, and he was, again, assaulted.  *See id.* at ¶¶ 58-59.  These circumstances are enough to raise a dispute of fact as to whether Plaintiff was living in conditions that were "sufficiently serious."

    **2.  *Subjective Prong***

        **a.  *Defendant Warner***

Defendants state that "Warner is the only individually-named Defendant who appears to have had any interaction with Plaintiff."  Dkt. No. 44-16 at 15.  Defendants admit that Plaintiff told Warner he was upset about being transferred out of Building B because Plaintiff felt comfortable there and wanted to stay.  *See id.*  Plaintiff asserts that Warner told Plaintiff that he was being thrown "back to the wolves" on Three East tier, but Defendants note that "Warner of course denied relating that conversation to Plaintiff."  *Id.* at 16.

Defendants acknowledge that "the disagreement between Plaintiff and Warner might understandably be construed at first blush to create a genuine dispute of material fact sufficient to defeat the instant motion for summary judgment[,] but [] respectfully submit that Plaintiff's allegation regarding that conversation fails to withstand scrutiny."  *Id.*  Specifically, Defendants assert that (1) the log book which indicates Warner was in Plaintiff's unit on the day of the alleged conversation does not "refer[] to any conversation, much less the decision alleged [sic] made concerning Plaintiff's impending move to Three East"; (2) Plaintiff's messages about "wolves" did not refer to a specific incarcerated individual; and (3) the word "wolves" does not appear in Plaintiff's deposition.  *Id.* at 16-17.

Defendants' arguments are unavailing and the Court concludes that Plaintiff has raised a genuine dispute of material fact as to whether Defendant Warner "knew, or should have known,

that" placing Plaintiff back in Three East "posed an excessive risk to [Plaintiff's] health or safety."

*Taylor v. City of New York*, No. 16-CV-7857, 2018 WL 1737626, *12 (S.D.N.Y. Mar. 27, 2018)

(quoting *Darnell*, 849 F.3d at 35).

Plaintiff testified during his deposition that when he was housed in Three East on July 9,

2021, after the assault, Plaintiff told Warner he could not live there and that Warner needed to

"get [Plaintiff] off this tier."  Dkt. No. 47-1 at 87.  Plaintiff stated that Warner responded, "[i]t was

above his pay grade and that they wasn't [sic] moving" Plaintiff.  *Id.*  Plaintiff then told Warner he

was going to kill himself and he wanted to see mental health.  *See id.* at 88.  This was a ploy to be

removed from the tier.  *See id.*  After being on constant suicide watch, Plaintiff avers that Warner

told Plaintiff he was throwing Plaintiff "back to the wolves."  Dkt. No. 47-13 at 26, ¶ 8.

On August 1, 2021, Plaintiff wrote a message to his family asking them to tell someone

"to write the affidavit about the statement 1 Sgt. Warner made in regards to his meeting with

Crudo about thro[w]ing me back to the wolves when I got off constant opp."  Dkt. No. 44-4 at

317.  On August 3, 2021, Plaintiff wrote another message stating as follows:

> [A] few we[e]ks prior to this and when they put me on the tier I told
> them I had problems with people on that tier and I told them I
> would kill myself just to get off the tier and they put me on
> su[ic]ide watch for 3 days then Sgt. Warner came to my cell and
> told me that him and Commander Crudo talk on Monday 19th and
> the decision was to thr[ow] me back to the wolves and I have
> someone that he[a]rd this and is willing to write an affidavit too.

*Id.* at 319.  On August 11, 2021, Plaintiff wrote another message explaining his circumstances and

stating that Warner had a conversation with Crudo "and the decision was to thr[ow] me back to

the wolves meaning put me back on third west with the dudes that gang assaulted me which they

did and that[']s how I got hospitalized the first time."  *Id.* at 322.

Additionally, as explained by Plaintiff, his movement log indicates that the "Reason" for Plaintiff's move on July 12, 2021, from One East back to Three East was "Per F/Sgt. Warner." Dkt. No. 47-7. Defendants argue that "[n]othing in the log book refers to any conversation, much less the decision alleged made concerning Plaintiff's impending move to Three East." Dkt. No. 44-16 at 16. This argument is without merit. There is no indication in the movement log that any conversations between a corrections officer and an incarcerated individual would be documented in a narrative format. *See* Dkt. No. 47-4. Likewise, Defendants argument that the word "wolves" does not appear in Plaintiff's deposition inappropriately places blame on Plaintiff. *See* Dkt. No. 44-16 at 16. A deposition is driven by the questions being asked. The fact that Defendants' counsel did not ask Plaintiff about the "wolves" messages is not Plaintiff's fault.

Warner testified during his deposition that did not recall and was unaware whether Plaintiff ever told Warner he had been previously assaulted. *See* Dkt. No. 44-12 at 56-57. Warner did recall a conversation with Plaintiff wherein Plaintiff expressed that he was upset about being moved from B building to Three East. *See id.* at 61. Warner did not recall Plaintiff saying anything about being suicidal. *See id.* Warner denied ever having a conversation with Commander Crudo about Plaintiff or ever telling Plaintiff there was nothing he could do to help Plaintiff about any safety concerns. *See id.* at 91-92.

In a report dated August 16, 2021, Defendant Warner indicated that he had "no recollection" related to Plaintiff's allegation about being moved to Three East. Dkt. No. 44-4 at 787. Warner stated that he was not responsible for any of Plaintiff's housing assignments, except for approving one transfer from Three East to the constant observation tier. *See id.*

Defendant Warner's contentions and lack of recollection are directly contrasted by Plaintiff's assertions. Plaintiff's allegations are supported by his deposition testimony, declaration,

16

and messages to family members. *See* Dkt. No. 47-3 at ¶¶ 5-6, 8-9; Dkt. No. 47-1 at 86-87, 91,

154; Dkt. No. 44-4 at 317, 319, 322, 792.

This dispute boils down to a credibility determination that is not for this Court to make

and is best left to a jury. *See Proctor v. LeClaire*, 846 F.3d 597, 607 (2d Cir. 2017) ("Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge") (quotations and quotation marks omitted).

Defendants argue that Plaintiff has not raised a triable issue because Plaintiff never

identified any of his attackers by name. *See* Dkt. No. 44-16 at 16; Dkt. No. 50 at 8. The Supreme

Court has stated that a prison official cannot "escape liability for deliberate indifference by

showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know

that the complainant was especially likely to be assaulted by the specific prisoner who eventually

committed the assault." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). The Second Circuit has

likewise noted that "[a]lthough a prisoner's identification of his enemies is certainly relevant to

the question of knowledge, it is not, necessarily, outcome determinative." *Hayes v. New York

City Dep't of Corr.*, 84 F.3d 614, 621 (2d Cir. 1996); *see also Tate v. City of New York*, No. 16-

CV-1894, 2017 WL 10186809, *12 (E.D.N.Y. Sept. 29, 2017); *Hill v. Annucci*, No. 9:18-CV-

1203, 2019 WL 8192266, *7 (N.D.N.Y. Nov. 25, 2019).

It is undisputed that there was an Uptown/Downtown rivalry at ACCF, which staff were

aware of. *See* Dkt. No. 47-13 at ¶ 2-4. There were divides among where individuals lived in

ACCF based on their affiliations and staff would usually try and address gang affiliations or

problems with individuals living on a specific tier. *See id.* at ¶¶ 7-10. Plaintiff testified that the

individuals who assaulted him on June 9, 2021, were Downtown members. *See id.* at ¶ 26.

Plaintiff was moved to B building, which was a mix of Uptown and Downtown individuals, but

he was later relocated to Three East tier. *See id.* at ¶¶ 31, 34. Three East was a Downtown tier. *See id.* at ¶ 9. Plaintiff testified that he told Defendant Warner he could not live on Three East because he recognized some of the individuals who assaulted him on June 9. *See id.* at ¶¶ 35-40. Plaintiff threatened suicide and was taken to constant observation, after which he testified and declared that Warner said he was throwing Plaintiff "back to the wolves . . . ." *Id.* at ¶¶ 41-44. Plaintiff was then moved back to Three East, where he was assaulted for the second time. *See id.* at ¶¶ 42, 50.

Although Plaintiff did not provide Defendant Warner with the "specific government names of his assailants," *id.* at ¶ 39, there is sufficient evidence in the record for a reasonable jury to conclude that, accepting Plaintiff as credible, Defendant Warner was aware of a specific and serious threat to Plaintiff's safety in the Three East tier by Downtown members, which Warner ignored. *See Ryan v. Bell*, 709 F. Supp. 3d 82, 88 (N.D.N.Y. 2024); *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995).

Accordingly, this aspect of Defendants' motion for summary judgment is denied.

### b. *Defendant Apple*

As to Defendant Apple, Defendants argue as follows:

> Plaintiff flatly exonerated Apple from liability during his deposition. Therein, when Plaintiff was asked what notification he gave to Apple, Plaintiff responded: "Nothing. I was in the hospital. My family did." . . . Plaintiff's deposition demonstrates he never provided Apple with knowledge of an excessive risk to his health or safety, never provided Apple with facts from which the Sheriff could, and subsequently did, draw an inference that a substantial risk of serious harm exists. Instead, Plaintiff expects acceptance on blind faith his allegation that his family did indeed notify Apple and that, in turn, Apple demonstrated deliberate indifference.

Dkt. No. 44-16 at 14 (quotation omitted). During Apple's deposition, he was asked whether he had ever heard of Plaintiff "[p]rior to being noticed for []his deposition[.]" Dkt. No. 44-10 at 28. Apple stated that he had only heard of Plaintiff upon being served with the complaint in this case. *See id.* Apple was asked if his office received phone calls from Plaintiff's family members to express concern for Plaintiff's safety or if he ever spoke to someone from Plaintiff's family about any safety concerns. *See id.* at 28-29. Apple responded, "Not that I can recall." *Id.*

Apple explained that, generally, if there is a call from family about an incarcerated individual's safety, "[d]epending on the circumstances of the call, usually the call would be pushed up to the correctional facility and asking them to address whatever concerns the family has." *Id.* at 30. He stated that there are no records documenting such phone calls. *See id.* at 31. He also testified that he was unaware of an incarcerated individual who had been assaulted three times over the course of two-to-three months in the summer of 2021. *See id.* at 34-35. Apple was unaware of an inmate who had sustained a fractured orbital bone in July 2021. *See id.* at 35.

However, Plaintiff's aunt, Ms. Boyd, declared under the penalty of perjury that "[a]fter each of the three assault incidents against [Plaintiff] at [ACCF] in 2021, [she] personally called Sheriff Craig Apple to report [her] concerns about [Plaintiff's] safety." Dkt. No. 47-5 at ¶ 3. Ms. Boyd detailed each of the calls in her declaration and specifically stated that Defendant Apple told her that he would look into the situation. *See id.* at ¶¶ 4-6.

In their reply, Defendants argue that Ms. Boyd's declaration is insufficient to raise a genuine dispute of material fact. *See* Dkt. No. 50 at 4-7. Defendants assert that in the messages between Plaintiff and an individual named "Kim" or "Boyd," no one ever told Plaintiff they spoke directly with Defendant Apple. *Id.* at 6. Defendants argue that Ms. Boyd's declaration marks the first time she indicated a direct conversation with Apple. *See id.*

Ms. Boyd's declaration is not the first time Defendants learned of there being purported conversations between Plaintiff's family and Defendant Apple.  In Plaintiff's deposition, dated January 19, 2024, he testified that his "Godmother's Laurie Bills and my Aunt Kim is Kim Boyd and her wife is – I don't even know her wife's last name, but they spoke to all of them."  Dkt. No. 47-1 at 146.  "All of them" meant "Craig Apple, Michael Lyons and Commander Grimes."  *Id.* at 147.  Plaintiff was specifically asked about his basis for believing that Sheriff Apple had personal knowledge of situation.  *See id.* at 143.  He testified "[m]y family spoke personally to Craig Apple."  *Id.* at 144.  Plaintiff also explained that before his current attorneys took his case, the "case was supposed to be taken by Lee Greenstein, which who in front of me in Albany Medical Center talked to Craig Apple on the phone and Craig Apple assured my safety."  *Id.*

In Plaintiff's messages to his family while he was incarcerated, Plaintiff said, "don[']t forget to call Lee Greenstein and *tell him how after Craig Apple gave you all his word I would be kept safe*[,] his officers opened my cell and allowed me to be gang assaulted against and that the bone in my eye is broken of [sic] and lodged under my eye muscle and now I might need another surgery."  Dkt. No. 44-4 at 321 (emphasis added).  Plaintiff wrote another message that same day, which appears to be a draft letter seeking legal help.  *See id.* at 322.  Plaintiff explained as follows:

> [T]hen while [I] was in the hospital[,] *my family talked to the albany county sheriff craig apple*, the superintendent michael lyons, and commander grimes and the all assured my family i would be placed into involentary [sic] protective custody or admistration segragation [sic] to insure my saf[e]ty here at this facility but yet i was put in population B building and suppose[d] to be medical keep lock and the officer opened my cell allowing me to be again gang assaulted for the third time. . . .

*Id.* (emphasis added). Additionally, an incident report dated July 23, 2021, notes, "Commander Crudo and Investigator Apple notified" of an assault on Plaintiff. Dkt. No. 47-9 at 4.

Defendants do not acknowledge the incident report in their reply. *See generally* Dkt. No. 50. Defendants also fail to rebut any of the cases cited by Plaintiff wherein a court determined there were disputes of fact because a plaintiff's family member contacted an individual defendant and/or defendant facility about safety concerns with the incarcerated plaintiff. *See* Dkt. No. 47-14 at 25-26 (citing, *inter alia*, *Heisler v. Kralik*, 981 F. Supp. 830, 838 (S.D.N.Y. 1997), *aff'd sub nom. Heisler v. Rockland Cnty.*, 164 F.3d 618 (2d Cir. 1998); *Hartry v. Cnty. of Suffolk*, 755 F. Supp. 2d 422, 427 (E.D.N.Y. 2010); *Gist v. Sommer*, No. 14-CV-6736, 2020 WL 905689, *8 (S.D.N.Y. Feb. 24, 2020)). Defendants do not present any case law which states that safety concerns must be communicated directly from the incarcerated individual to a defendant to satisfy the subjective prong of a deliberate indifference claim. *See generally* Dkt. Nos. 44-16, 50.

Based on the foregoing, Plaintiff has raised a genuine dispute of material fact concerning Defendant Apple's subjective knowledge about the risk of harm to Plaintiff. Plaintiff presents evidence that his family spoke directly with Apple on multiple occasions about their concerns for Plaintiff's physical safety and a correction officer informed Apple of the July 23, 2021, physical altercation between Plaintiff and other incarcerated individuals. Whether Plaintiff and Ms. Boyd are believable compared to Defendant Apple is a question for a jury.

Finally, in a separate section of their memorandum of law, Defendants argue that even if they knew about a serious risk to Plaintiff's safety, they cannot be held liable because they responded reasonably to Plaintiff's concerns. *See* Dkt. No. 44-16 at 17. Defendants assert that, "[t]aken together, none of the ACCF staff, Apple, Lyons, and Warner included, could have possibly anticipated the incident because they were never presents with any facts that would

permit them to draw an inference that a substantial risk of serious harm existed." *Id.* at 19. The Court disagrees because, as explained, there are questions of fact concerning what the Defendants knew or should have known; therefore, the Court cannot conclude as a matter of law whether their conduct was reasonable in response to information they may or may not have known at the time. Thus, this aspect of Defendants' motion is denied.[4]

## IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that the Defendants' motion for summary judgment (Dkt. No. 44) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Plaintiff's complaint against Defendant Lyons is **DISMISSED**, and the Court further

**ORDERS** that Plaintiff's deliberate indifference claims against Defendants Apple and Warner, and corresponding state law claims, shall proceed;[5] and the Court further

---

[4] Because the Court has concluded there are disputes of fact concerning Plaintiff's deliberate indifference claims, the Court denies Defendants' motion insofar as it raises a qualified immunity defense and seeks dismissal of Plaintiff's state law negligence and recklessness claims. *See* Dkt. No. 44-16 at 20-22; *see also Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 410 (E.D.N.Y. 2023) ("The Court need not, however, come to a decision on the merits of qualified immunity. There exist genuine and material disputes of fact at this stage, including whether Defendant [] called Plaintiff a snitch, that preclude summary judgment based on qualified immunity"); *Hill v. McGrath*, No. 9:18-CV-1203, 2021 WL 4255040, *12 (N.D.N.Y. Aug. 10, 2021).

[5] Defendants did not move for summary judgment on behalf of the County of Albany. *See generally* Dkt. Nos. 44-6, 50. Therefore, the County of Albany remains a Defendant in this action.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 25, 2025
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

23